1

2          **E-Filed 5/17/2010**

3

4

5

6

7                    DESIGNATED FOR PUBLICATION

8              **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                         **SAN JOSE DIVISION**

11

12   KAREN BETH YOUNG,                    Case Number 5:10-cv-03579-JF/PVT

13                    Plaintiff,          ORDER GRANTING MOTION TO
                                          DISMISS
14          v.

15   FACEBOOK, INC.,                      [re: docket no. 48]

16                    Defendant.

17

18          Plaintiff Karen Beth Young brings this action against Defendant Facebook, Inc., alleging

19   violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, the Unruh

20   Civil Rights Act, Ca. Civ. Code § 51, *et seq.*, the California Disabled Persons Act, Cal Civ. Code

21   § 54, *et seq.*, and state-law contract and negligence claims.  Although Young's amended

22   complaint describes vividly her personal experience of losing access to her online social

23   community and the challenges she faced attempting to obtain redress through Facebook's

24   automated customer care systems, it does not state a legal claim upon which relief may be

25   granted.  Accordingly, Facebook's motion to dismiss will be granted.

26

27

28

# I. BACKGROUND

Young opened a personal account with Facebook in February 2010.[1]  She subsequently created additional Facebook pages for the "Cancer Forum," "Cartesian Plane For The Cure," "Karen Beth Young - Public Figure," and "Join Karen Petition Facebook Say No to 5000 Friends."  Young sent "friendvites" to others she believed were interested in cancer-related issues and developed "genuine and heartfelt" relationships with those she met online.  Young's personal page grew to include approximately 4,300 "friends."

In June 2010, Young's Facebook account was deactivated for the first time.  According to an email from Facebook, Young's account was disabled for behavior identified as potentially harassing or threatening to other Facebook users, including sending "friend" requests to people she did not know, regularly contacting strangers, and soliciting others for dating or business purposes.  Resp. Ex. A-1.  She was told that the decision was final and could not be appealed. *Id.*  Young, who states that she suffers from bipolar disorder, was upset by having the ties to her online social network severed.  She made numerous email and telephone inquiries regarding the deactivation of her account, but Facebook's response did not include any "human interaction." Compl. ¶ 7.  She then drove from her home in Maryland to Facebook's headquarters in Santa Clara, California.  There, Young was told by a receptionist that she could not meet with anyone in person or by telephone.  However, she was allowed to fill out a written form requesting assistance.

Two days later, in response to that written request, Young received an email stating that her account had been disabled because Facebook's security systems had determined that she had been sending "friend" requests too quickly or that her "friend" requests were being ignored at a high rate.  Compl. Ex. D-4.  She was told that her account would be reactivated, but she was warned that sending "friend" requests to people she did not know–or other violations of

---

[1]For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969).  This relevant facts are drawn from Young's complaint and related exhibits.

2

Facebook's Statement of Rights and Responsibilities–would result in her account being disabled permanently. *Id.* Young responded to the email requesting clarification and a personal meeting. Receiving no response, she returned to Maryland, where after two days her account was deactivated again. She received another email informing her that her account had been disabled permanently because she had violated the Statement of Rights and Responsibilities, that it would not be reactivated for any reason, and that she would not be provided further information about her violation or an opportunity to appeal. *Id.* Young then drove to California a second time and commenced the instant proceedings.

## II. STANDARD OF REVIEW

Under Fed. R. Civ. P. Rule 8(a), a plaintiff must plead her claim with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 545, 544 (2007). Dismissal for failure to state a claim under Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). The pleading of a *pro se* litigant is held to a less stringent standard than a pleading drafted by an attorney, and is afforded the benefit of any doubt. *Hebbe v. Pliler*, 611 F.3d 1202, 1205 (9th Cir. 2010). Further, a *pro se* litigant must be given leave to amend unless it is clear that the deficiencies of the complaint cannot be cured by amendment. *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995).

## III. DISCUSSION

**A.**     **Young Has Not Stated a Claim For Violation of the ADA**.

Young alleges that she suffers from bipolar disorder and that Facebook unlawfully discriminated against her by failing to provide reasonable customer services to assist individuals with mental disabilities. FAC ¶ 31. In order to prevail on a discrimination claim under Title III, a plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability. *Ariz. ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 670 (9th Cir. 2010). Under

3

1    controlling Ninth Circuit authority, "places of public accommodation" under the ADA are

2    limited to actual physical spaces. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104,

3    1114 (9th Cir. 2000).

4          Facebook's Statement of Rights and Responsibilities defines "Facebook" as "the features

5    and services [Facebook Inc.] make[s] available, including through (a) [its] website at

6    www.facebook.com and any other Facebook branded or co-branded websites . . . (b) [its]

7    Platform; and (c) other media, software (such as a toolbar), devices, or networks now existing or

8    later developed." FAC, Ex. A at ¶ 17. Despite its frequent use of terms such as "posts" and

9    "walls," Facebook operates only in cyberspace, and is thus is not a "place of public

10   accommodation" as construed by the Ninth Circuit. While Facebook's physical headquarters

11   obviously is a physical space, it is not a place where the online services to which Young claims

12   she was denied access are offered to the public.

13         In dismissing Young's original complaint, the Court observed that in order to state an

14   ADA claim, Young "would have to show that Facebook was a place of public accommodation

15   within the meaning of the ADA." Order of October 25, 2010. In her amended complaint, Young

16   relies on precedent from other circuits indicating that "public accommodations" are *not* limited

17   to physical structures. *See, e.g.*, *Carparts Distribution Center, Inc. v. Automotive Wholesalers'*

18   *Ass'n of New England*, 37 F.3d 12, 19 (1st Cir. 1994) ("public accommodations" encompasses

19   more than actual physical structures and included defendant insurance company); *Pallozzi v.*

20   *Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 2000) (ADA applies to insurance offerings); *Doe v.*

21   *Mutual of Omaha Ins. Co.* 179 F.3d 557, 559 (7th Cir. 1999); *Rendon v. Valleycrest Productions*

22   *Ltd.*, 294 F.3d 1279 (11th Cir. 2002). However, this Court must adhere to Ninth Circuit

23   precedent. *See Ky Minh Pham v. Hickman*, 262 Fed. Appx. 35, 39 (9th Cir. 2007) ("[I]n the

24   absence of Supreme Court law, [a district court] is bound to follow Ninth Circuit precedent.");

25   *cf. Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 952 ("The Ninth Circuit has

26   declined to join those circuits which have suggested that a 'place of public accommodation' may

27   have a more expansive meaning.").

28         Young also contends that Facebook's services have a sufficient "nexus" to a physical

4

1  place of public accommodation.  In *Nat'l Fed'n of the Blind*, the plaintiffs alleged that Target's

2  website was inaccessible to the blind and thus violated the ADA.  The court held that plaintiffs

3  stated a claim under the ADA to the extent that they could demonstrate a nexus between the

4  alleged discrimination on the website and at Target's "brick and mortar" place of public

5  accommodation.  Here, Young alleges that Facebook sells its gift cards in various retail stores

6  across the country, and she contends that the alleged discrimination on Facebook's website

7  deprives her of full and equal access to the goods and services provided by Facebook through

8  physical retail stores.  However, Title III provides that "[n]o individual shall be discriminated

9  against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

10 privileges, advantages, or accommodations of any place of public accommodation *by any person*

11 *who owns, leases (or leases to) or operates* a place of public accommodation."  42 U.S.C. §

12 12182(a) (emphasis added).  While the retail stores that sell Facebook gift cards may be places

13 of accommodation, Young does not allege that Facebook, Inc. "owns, leases (or leases to) or

14 operates" those stores.  Facebook's internet services thus do not have a nexus to a physical place

15 of public accommodation for which Facebook may be liable under the statute.

16 **B.**   **Young Has Not Stated a Claim For Violation of the Unruh Civil Rights Act or California's Disabled Persons Act.**

17

18         **1.  Unruh Civil Rights Act**

19         The Unruh Civil Rights Act provides that, "[a]ll persons within the jurisdiction of this

20 state are free and equal, and no matter what their . . . disability . . . are entitled to the full and

21 equal accommodations, advantages, facilities, privileges, or services in all business

22 establishments of every kind whatsoever."  *Id.* at § 51(b).  A violation of the Unruh Act may be

23 maintained independent of an ADA claim only where a plaintiff pleads "intentional

24 discrimination in public accommodations in violation of the terms of the Act."  *Munson,* 46 Cal.

25 4th at 698 (quoting *Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1175 (1991).  The

26 California Supreme Court has concluded that the Act requires allegations of "willful, affirmative

27 misconduct," and that a plaintiff must allege more than the disparate impact of a facially neutral

28 policy on a particular group.  *See Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824,

5

854-54 (2005).

Young claims that Facebook discriminated against her by terminating her account and addressing her concerns with "automated responses" and "[p]regenerated notices" rather than a human customer service system that assists individuals with mental disabilities.  FAC ¶¶30-31. However, she does not allege any facts from which intentional discrimination may be inferred. Although she alleges that Facebook's customer service system was particularly difficult for her to use because of her bipolar disorder, she does not allege that Facebook treated her differently *because* of her disability, nore does not show that Facebook applies its policies in a way that *targets* individuals with disabilities.  Indeed, the essence of Young's complaint is that Facebook's account management and customer service systems treat *all* users in the same cold, automated way.

## 2. California's Disabled Persons Act

California's Disabled Persons Act provides that "[i]ndividuals with disabilities . . . have the same right as the general public to the full and free use of the streets, highways, sidewalks, walkways, public buildings, medical facilities, including hospitals, clinics, and physicians' offices, public facilities, and other public places."  Cal. Civ. Code §§ 54,  54.1(a)(1).  "Full and equal access" is defined by § 54.1 to mean access that complies with the regulations developed under the ADA, or under state statutes, if the latter impose a higher standard.  *Id.* 54.1(a)(3); *Urahausen v. Longs Drug Stores Cal., Inc.*, 155 Cal. App. 4th 254, 263 (Cal. App. 2007). Young has not pointed to any relevant standards established by California law that exceed those set by the ADA and has thus not provided a basis for a claim under the Disabled Persons Act that is separate from her ADA claim.

## C. Young Has Not Stated a Claim For Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, or Negligence.

### 1. Breach of Contract

Under California law, "when a contract has been reduced to writing, a court must ascertain the parties' intent from the writing alone, if possible." *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 836 (9th Cir. 1996) (citing Cal. Civ. Code § 1636).  In an action for breach of a

6

1   written contract, a plaintiff must allege the specific provisions in the contract creating the

2   obligation the defendant is said to have breached.  *Miron v. Hermalife Int'l, Inc.*, 11 Fed. Appx.

3   927, 929 (9th Cir. 2001).  In its order dated October 25, 2010, the Court dismissed Young's

4   contract claim because the complaint failed to identify with any particularity how Facebook

5   breached any obligation it undertook in its Statement of Rights and Responsibilities.

6        Young's amended complaint provides no further specificity as to what contractual

7   provisions Facebook allegedly violated.  She contends that Facebook "did not perform in

8   accordance with the terms of agreement in their Statement of Rights and Responsibilities

9   contract by arbitrarily and impulsively handling Plaintiffs member account."  FAC ¶ 103.

10  However, the amended complaint does not allege any provision of the contract prohibiting

11  Facebook from terminating an account in the manner alleged.  The termination provision of the

12  Statement of Rights and Responsibilities provides expressly that when a user account is

13  terminated, Facebook "will notify you by email or at the next time you attempt to access your

14  account." Compl. Ex. A-2.  Young's amended complaint indicates that she did receive such an

15  email.  Given this express language, Facebook could not have an implied obligation to provide a

16  different termination process.

17        **2.  Breach of the implied covenant of good faith and fair dealing**

18        Under California law, "there is implied in every contract a covenant by each party not to

19  do anything which will deprive the other parties thereto of the benefits of the contract."  *Harm v.*

20  *Frasher*, 181 Cal. App. 2d 405, 417 (Cal. Ct. App. 1960).  However, the "implied covenant of

21  good faith is read into contracts in order to protect the express covenants or promises in the

22  contract, not to protect some general public policy interest not directly tied to the contract's

23  purpose." *Schulken v. Wash. Mut. Bank*, No. C. 09-02708 JW, 2009 U.S. Dist. LEXIS 114030,

24  at *16 (N.D. Cal. Nov. 9, 2009).  To state a claim for breach of the implied covenant, a plaintiff

25  must show "that the conduct of the defendant, whether or not it also constitutes a breach of a

26  consensual contract term, demonstrates a failure or refusal to discharge contractual

27  responsibilities." *Careau & Co. v. Security Pacific Business Credit, Inc.*, 22 Cal. App. 3d 1371,

28  1395 (Cal. Ct. App. 1990).  The implied covenant will not apply where "no express term exists

7

1    on which to hinge an implied duty, and where there has been compliance with the contract's

2    express terms." *In re Facebook PPC Advertising Litigation*, No. 5:09-cv-03043-JF, 2010 U.S.

3    Dist. LEXIS 39776, at *14 (quoting *Berger v. Home Depot U.S.A., Inc.*, 476 F. Supp. 2d 1174,

4    1177 (C.D. Cal. 2007)). In other words, a party must take on an obligation, either expressly or

5    impliedly, before it can be said to have acted in bad faith by not carrying it out.

6         In its order dated October 25, 2010, the Court dismissed Young's claim for breach of the

7    implied warranty of good faith and fair dealing failed because Young did not "allege that the

8    termination of her account was undertaken in bad faith or violated Facebook's contractual

9    obligations." The Court also noted that to state a claim for breach of the implied covenant of

10   good faith and fair dealing, Young would have to show that Facebook actually took on the

11   obligation it allegedly violated.

12        In her amended complaint, Young alleges that Facebook "violated the spirit of its terms

13   of agreement by not showing concern or offering assistance when their computer system flagged

14   Plaintiffs account." FAC ¶ 112. However, she does not point to any express or implied

15   obligation requiring Facebook to show such concern or offer such assistance. Facebook

16   expressly reserves the right to terminate the accounts of users who "violate the letter or the spirit

17   of [its Statement of Rights and Responsibilities], or otherwise create risk or possible legal

18   exposure" for Facebook. Compl. Ex. A-2. As noted above, the Statement of Rights and

19   Responsibilities identifies the minimal procedures Facebook promises its users. *See id.*

20   (providing that if an account is terminated Facebook "will notify you by email or at the next time

21   you attempt to access your account").

22        In its previous order, the Court observed that although "[i]t is at least conceivable that

23   arbitrary or bad faith termination of user accounts, or even termination of user accounts with no

24   explanation at all, could implicate the implied covenant of good faith and fair dealing," Young's

25   original complaint did not allege that her account was terminated despite her compliance with

26   the terms of the Statement of Rights and Responsibilities. The amended complaint similarly fails

27   on these grounds. The amended complaint states that Facebook sent Young an email informing

28   her that it was taking action "due to a percentage of interactions or some other friend interaction

8

1   problem that had unverifiable data/information." *Id.*  The email, which Young included as an

2   exhibit to her complaint, states that Facebook's security system flagged her account as

3   potentially abusive, either because Young was "sending friend requests too quickly" or because

4   her friend requests were "being ignored at a high rate."  Compl. Ex. D-4.  The email stated that

5   Facebook does not "endorse contacting strangers through unsolicited friend requests as they may

6   be considered annoying or abusive," and concluded: "Please be aware that sending friend

7   requests to people you don't know, or further violations of Facebook's statement of Rights and

8   Responsibilities, will result in your account being permanently disabled." *Id.*  Particularly in

9   light of this exhibit, Young has not alleged facts indicating that Facebook's termination of her

10  account violated the implied covenant of good faith and fair dealing.

11          **3.  Negligence**

12          In dismissing the negligence claim in Young's original complaint, the Court noted that

13  Young had failed to allege that Facebook owed her a legal duty.  In her amended complaint,

14  Young alleges that Facebook "deleted Plaintiff's account without reasonable care," "did not use

15  due care in reasonably addressing Plaintiff's account issues," and "did not use due care in

16  adhering to their [sic] contractual obligations connected with the Facebook Statement of Rights

17  and Responsibilities."  FAC ¶¶ 121-23.  However, Young does not identify any contractual basis

18  for these alleged duties, and she cites no legal authority for any non-contractual duty that would

19  give rise to a tort claim.

20                          **IV.  CONCLUSION**

21          The Court is not without sympathy for Young's plight.  Young was understandably

22  frustrated that she could not discuss the termination of her account with a live person, and both

23  this frustration and the loss of her access to Facebook's social network had a particularly acute

24  impact on Young because of her bipolar condition.  As customer service functions increasingly

25  are handed over to automated systems, it is important that service providers, such as Facebook,

26  understand the implications that such practices can have for the less sophisticated and more

27  vulnerable.  However, because Young's amended complaint does not state a cognizable legal

28  basis upon which relief may be granted, it must be dismissed.  Because the amended complaint

9

Case No. 5:10-cv-03579-JF/PVT
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

1  fails to address many of the issues identified by the Court in its previous order, and because it

2  appears that there is no realistic possibility that further amendment could cure the deficiencies in

3  Young's pleadings, leave to amend will be denied.

4                                          **ORDER**

5          Accordingly, it is hereby ordered that the motion to dismiss is granted, without leave to

6  amend.  The Clerk shall enter judgment and close the file.

7  IT IS SO ORDERED.

8  DATED: May 17, 2011

9                                    _____
                                      JEREMY FOGEL
10                                    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 5:10-cv-03579-JF/PVT
ORDER GRANTING MOTION TO DISMISS
(JFLC3)

1

2            **IN THE UNITED STATES DISTRICT COURT**

3

4         **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

5                   **SAN JOSE DIVISION**

6

7

8 KAREN BETH YOUNG,            | Case Number 5:10-cv-03579 JF/PSG

9            Plaintiff,

10                        | CERTIFICATE OF SERVICE

11        v.

12 FACEBOOK, INC.,

13            Defendants.

14

15

16

17         I, the undersigned, hereby certify that I am an employee of the Office of the Clerk,
18 United States District Court, Northern District of California.

19         On May 17, 2011, I served a true and correct copy of the attached document to each of
20 the persons hereinafter listed by placing said copy in a postage paid envelope and depositing said
envelope in the United States mail, or by placing said envelope in the outgoing mail delivery
21 receptacle located in the Clerk's Office:

22 Karen Beth Young
23 P.O. Box 2335
24 San Jose, CA 95109

25 DATED:   May 17, 2011                 For the Court
26                               Richard W.  Weiking, Clerk

27                               By:  _____/s/_____
                                    Diana Munz
28                                    Courtroom Deputy Clerk

Case No. 5:10-cv-03579-JF/PVT
ORDER GRANTING MOTION TO DISMISS
(JFLC3)